UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUDOLPH ROSSI,

                              Plaintiff,

              -v-

                                                    Case No. 04-CV-01836 (KMK)

B. STEVENS, R. PANGBORN, M. MILLER, R.              <u>OPINION AND ORDER</u>
SNEDDEN, M. RHYNDERS, Correction Officers; A.
MONTEGARI, Sergeant; J. TEMPLE, Hearing
Officer; and WILLIAM PHILLIPS, Superintendent of
Green Haven Prison,

                              Defendants.

<u>Appearances:</u>

Rudolph Rossi
87-A-9513
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, NY 12051
*Pro Se Plaintiff*

Jose Luis Velez, Esq.
New York State Office of the Attorney General
120 Broadway
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

         Plaintiff Rudolph Rossi ("Plaintiff"), a former inmate at the Green Haven Correctional

Facility, proceeding *pro se*, brought this action on February 20, 2004, pursuant to 42 U.S.C. §

1983, against Defendant Corrections Officers ("COs") B. Stevens ("Stevens"); R. Pangborn

("Pangborn"); M. Miller ("Miller"); R. Snedden ("Snedden"); M. Rhynders[1] ("Rhynders");

---

[1] Although this Defendant's name is spelled "Rynders" in several of the moving papers, the correct spelling is Rhynders. (Report and Recommendation of Mag. Judge Smith ("Smith R&R") 3 n.6.)

Sergeant A. Montegari ("Montegari"); Hearing Officer J. Temple ("Temple"); and Superintendent of Green Haven Prison W. Phillips ("Phillips") (collectively, "Defendants"). Plaintiff alleges that he was a victim of excessive force used by COs Stevens, Pangborn, Miller, Snedden, Rhynders, and Montegari; that he was deprived of due process by Temple; and that he was deprived of access to the courts by Phillips. Plaintiff seeks compensatory and punitive damages as well as injunctive and declaratory relief. Defendants have moved for Summary Judgment on each of Plaintiff's claims. For the reasons stated in this opinion, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.  Background

### A.  Facts

At all relevant times, Plaintiff was incarcerated at Green Haven Correctional Facility.[2] He alleges that on July 30, 2003, he was "arbitrarily singled out from a group of prisoners under the false pretext that [he] had contraband in [his] left pocket." (Compl. ¶ 13.) Plaintiff recounts that he was told to move up in the line of prisoners, but he replied to the officer that he "could not move up any closer." (Rossi Aff. ¶ 3.) Plaintiff was then told to step out of line and was taken to a secluded corner, out of sight of the other inmates. (Compl. ¶14; Pl.'s Decl. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Decl.") ¶ 4.) Plaintiff was ordered to face the wall but admittedly refused to do so. (Pl.'s Ex. B, Rossi Dep. (hereinafter "Pl.'s Ex. B"), 90.) He was then "grabbed . . . by the left elbow" and told to face the wall. (Rossi Aff. ¶ 3.) Plaintiff then

---

[2] Plaintiff is incarcerated after being convicted by a jury on March 14, 1991 of murder in the second degree, assault with intent to cause serious injury with a weapon in the second degree, and criminal possession of a weapon in the second degree. (Defs.' Ex. A, Rossi Dep., 17-18.) Currently, he is housed at Coxsackie Correctional Facility.

followed orders to assume the pat-frisk position.  (Pl.'s Ex. B, 90.)  He was subsequently searched and no contraband was found.  (Compl. ¶ 14.)  Plaintiff was then told to put his hands in his pockets and ordered to put his toes against the wall.  (Pl.'s Ex. B, 91.)  Plaintiff, however, refused to follow the order.  (*Id*., 15.)  At this point, the stories of Plaintiff and Defendants diverge significantly.

Plaintiff alleges that he was then "pushed into the wall and struck in the back of the head," and he responded by attempting to "spin out of the corner" and "push[] them off [him]." (*Id*., 91.)  Plaintiff denies making any type of move while being pat-frisked.  (Pl.'s Ex. A, 369.) A struggle ensued during which Pangborn grabbed Plaintiff's waist while "Stevens was trying to hit [Plaintiff] and after that [Plaintiff] was wrestled to the floor."  (Pl.'s Ex. B, 92.)  Then, according to Plaintiff, Snedden put Plaintiff in a figure-four leg lock, after which Montegari arrived and gave Stevens restraints to handcuff Plaintiff.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J.  ("Pl.'s Mem.") 7 (noting that Snedden claims to have applied the figure-four leg lock.).)  After he was handcuffed, Plaintiff alleges he was "thrown into the corner" and they "continued to punch, kick and one of them was using the bat stick."  (Pl.'s Ex. B, 92.)  After Sergeant Montegari ordered them to stop, Plaintiff was led down a hall by Rhynders and Miller toward the Special Housing Unit ("SHU") (*id*., 93-94); the group stopped at a control booth and Plaintiff claims that the guard inside kicked Plaintiff after the officers told the guard Plaintiff had assaulted the staff.  (*Id*., 94.)  Plaintiff was led into the "nurses' station" and Rhynders and Miller "continued to punch [him] in the head, neck, side."  (*Id*., 94.)  Montegari showed up and told them to stop, and no further violence occurred.  (*Id*., 95.)  Plaintiff was then taken to the SHU, strip-searched, and examined by a doctor.  (*Id*., 96.)  Plaintiff claims that as a result of the

alleged assaults, he sustained injuries to the "head, ribs, back, legs, shoulder, and arm." (Compl. ¶ 18.) Plaintiff further claims that after the incident occurred, the COs "wrote misbehavior reports that falsely accused [Plaintiff] of refusing a direct order" to face the wall for a pat-frisk (Pl.'s Ex. B, 84) – though Plaintiff acknowledges he refused such order (*id.*, 84) – and of "violating pat frisk procedure, and assault[ing]" prison staff "to justify their violent conduct." (Compl. ¶¶ 19-20.)

Defendants conversely claim that Plaintiff refused orders from the COs, violated pat frisk procedure, and assaulted the COs. (Defs.' Rule 56.1 Statement ("Defs. 56.1") ¶¶ 21-25.) Specifically, Defendants allege that as Pangborn was performing a pat-frisk, Plaintiff spun to his left "causing CO Pangborn to bend down while Plaintiff struck CO Stevens once in the left side of his head with a clenched right fist." (Defs.' 56.1 ¶ 23.) A struggle ensued during which Pangborn grabbed Plaintiff's waist, and "[a]fter Plaintiff struck CO Stevens, Stevens . . . grabbed [P]laintiff's right hand with his left hand . . . ." (*Id.*) Plaintiff then attempted to "hit CO Stevens several times with a closed left fist and to kick him." (*Id.*) While CO Pangborn attempted to wrestle Plaintiff to the floor, Plaintiff continued "punching, kicking, and spinning wildly" as Plaintiff attempted to try to break free from Pangborn's hold. (*Id.*) In the commotion, Pangborn was pulled off his feet and dragged across the corridor floor. (*Id.*) Defendants also allege that after Plaintiff was restrained with handcuffs, the officers used no further force on Plaintiff. (*Id.* ¶ 25.)

On July 31, 2003, the New York Department of Correctional Services ("DOCS") Inspector General's ("IG") Office investigated Plaintiff's claim that he was assaulted by staff. (Defs.' 56.1 ¶ 28.) The IG Office interviewed Plaintiff, the Sergeant, the COs involved, and

several inmate witnesses and found that Plaintiff's claims were unsubstantiated for the following reasons: (1) the documentation of Plaintiff's medical examination was "consistent with the use of force reported by staff" (*id*. ¶ 29); (2) the inmate interviews did not corroborate Plaintiff's claims because the inmates were unable to observe any of the incidents (*id*.); and (3) Plaintiff was issued a Tier III Misbehavior Report charging him with Assault on Staff, Refusing a Direct Order, and Refusing a Search or Frisk (*id*.).

Plaintiff alleges that a subsequent Tier III disciplinary hearing conducted by Defendant Temple violated his due process rights because he was denied the right to have his hearing conducted by a fair and impartial hearing officer; to "present documentary evidence;" to receive "written specification" of the grounds for the Tier III hearing; and to have the disposition based on "substantial evidence." (Compl. ¶ 21.) Plaintiff was found guilty at the hearing of all charges and was placed in SHU confinement for one year without privileges. (*Id*. ¶ 22.) He appealed the hearing decision to Donald Selsky, Director of the SHU, but the decision was affirmed. (*Id*. ¶¶ 23-24.)

Finally, Plaintiff claims that during his confinement in the SHU, his outgoing mail was thrown out. (Compl. ¶¶ 44-50.) Specifically, he alleges that he tried to mail, from the SHU, objections to a Report and Recommendation regarding a separate legal proceeding, but that the objections never reached the District Court in the Northern District of New York because they were thrown out by the prison guard who collected the mail. (Rossi Aff. ¶ 9.)

B. Procedural History

Plaintiff's Complaint was received by the *Pro Se* office on February 20, 2004. On July 14, 2004, Defendants filed a Motion to Dismiss asserting that Plaintiff failed to exhaust his

administrative remedies, that he failed to state a claim on which relief could be granted, that Defendants were entitled to Eleventh Amendment immunity, and that Plaintiff was not entitled to injunctive relief. (Smith R&R 1.) The case was referred to Magistrate Judge Lisa Margaret Smith for a report and recommendation.[3] On May 2, 2005, Magistrate Judge Smith recommended that the Motion to Dismiss be granted in part and denied in part. Specifically, Magistrate Judge Smith concluded that Plaintiff had stated a claim of excessive force, that Plaintiff had stated a due process claim but only with regard to Defendant Temple, that Plaintiff had stated an access to courts claim, but only with regard to Superintendent Phillips, and that Plaintiff had failed to state a claim of denial of religious accommodation.[4] Accordingly, Magistrate Judge Smith recommended that Plaintiff's excessive force claim should proceed against Defendants Stevens, Pangborn, Miller, Snedden, Rhynders, and Montegari, the due process claim should proceed against Defendant Temple, and the access to courts claim should proceed against Defendant Phillips.

On June 17, 2005, Judge Colleen McMahon accepted the Report and Recommendation in its entirety.[5] After discovery, Defendants moved for Summary Judgment on all claims.

---

[3] This case was referred by Judge Colleen McMahon, the judge to whom this case was originally assigned. On August 6, 2007, the case was reassigned to this Court.

[4] Magistrate Judge Smith reached these conclusions only after finding that Plaintiff had properly exhausted his administrative remedies on each of the underlying claims. (Smith R&R 14 ("Accordingly, I conclude . . . that Plaintiff has exhausted his administrative remedies with respect to all claims raised in the underlying action.").)

[5] Judge McMahon did disagree with one portion of the due process analysis of Magistrate Judge Smith's Opinion, but the disagreement did not affect the outcome of the motion.

<u>II. Discussion</u>

<u>A. Standard of Review</u>

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id*. (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted)).

The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the

Court is not charged with weighing the evidence and determining its truth, but with evaluating whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (citing *Anderson*, 477 U.S. at 249). A court's goal should be to "isolate and dispose of factually unsupported claims . . . ." *Celotex*, 477 U.S. at 323-24.

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest*.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)) (emphasis in original). This more lenient approach to construing a *pro se* plaintiff's pleadings, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).

B.  Analysis

1.  Excessive Force Claim

Plaintiff alleges that Defendants undertook "completely needless use of force against him," (Pl.'s Mem. 9), that was "maliciously intended to cause harm," (*id*. 10), and that, as a result, Plaintiff suffered severe injuries (Pl.'s Resp. in Opp'n to Defs.' 56.1 ("Pl.'s 56.1 Resp.") ¶ 45.) "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Sims*, 230 F.3d at 21 (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (internal quotation marks omitted)). The "core judicial inquiry" in analyzing the subjective prong is whether the force in question was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see also Sims*, 230 F.3d at 21.

The objective component of a cruel and unusual punishment claim, on the other hand, focuses on the harm done, and thus asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "However, no such showing of extreme injury is required when the claim is that prison officials used excessive force." *Sims*, 230 F.3d at 21. As noted by the Supreme Court in *Hudson*:

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . . This is true whether or not significant injury is evident.

*Hudson*, 503 U.S. at 9 (internal citations omitted); *see also Sims*, 230 F.3d at 21 (quoting *Hudson*, 503 U.S. at 9). Thus, although "a '*de minimis* use of force will rarely suffice to state a constitutional claim,'" *id*. at 22 (quoting *Romano*, 998 F.2d at 105), and not "every malevolent touch by a prison guard gives rise to a federal cause of action," *Hudson*, 503 U.S. at 9, "a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain," *Jeanty v. County of Orange*, 379 F. Supp.

2d 533, 539 (S.D.N.Y. 2005) (citing *Sims*, 230 F.3d at 21-22 (internal quotation marks omitted)).

In examining whether the excessive force inflicted wanton and unnecessary pain, the following factors thus are relevant: (1) the "extent of injury suffered," (2) the "need for application of force," (3) "the relationship between that need and the amount of force used[,] [(4)] the threat 'reasonably perceived by the responsible officials[,]' and [(5)] 'any efforts made to temper the severity of a forceful response.'" *Hudson,* 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)); *see also Jeanty*, 379 F. Supp. 2d at 540 (same).

In this case, the Parties offer materially different accounts of the July 30 incident. Though Plaintiff's evidence is minimal – it consists primarily of his own testimony – it is nevertheless sufficient to indicate the existence of a disputed material fact as to whether the force allegedly applied to him was wanton and unnecessary.[6]

Plaintiff states in his sworn affidavit that the force used by the COs against him was unnecessary because he had not exhibited any violent inclinations at the time force was initiated:

---

[6] At his deposition, Plaintiff testified that Defendants inflicted wanton and unnecessary force upon him. Accordingly, Plaintiff need not show extreme injury to satisfy the objective prong of his Eighth Amendment claim. The evidence presented by the Parties demonstrates that the injuries, while not terribly severe, are sufficient to satisfy Plaintiff's relatively light burden. The injuries, as detailed by the prison medical examiner on the evening that the events occurred, include: (1) swelling 1" x 2" in diameter on the right side of skull; (2) an abrasion to the left side of the mid-back approximately ½" long; and (3) bruises in the mid-spinal cord area, right elbow and legs. (Pl.'s Ex. I, 1; Defs.' 56.1 ¶ 30.) Plaintiff also complains of pain in all areas mentioned. (Defs.' 56.1 ¶ 30) In addition, Plaintiff continued to complain of pain in the months after the incident, was re-examined several times, and was noted to have, among other injuries, rotator cuff syndrome and a possible tear in his shoulder. (Pl.'s Ex. I, 2). These injuries are sufficient to get past summary judgment in this case. *See Griffen v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) (noting that even though the plaintiff-inmate's injuries were relatively minor, summary judgment was inappropriate because there were "genuine issues of material fact concerning . . . whether the guards maliciously used force against him," and "the malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se . . . whether or not significant injury is evident.").

> After the search was completed . . . .  Stevens told me to step up to
> the wall and place my toes against the wall and when I asked him
> for what, I was pushed into the wall and struck in the back of the
> head.  I then realized what was going to happen and tried to get out
> of the corner but Pangborn had me around the waist and wrestled
> me to the floor.  When I was taken to the floor, Pangborn put me in
> a choke-hold and Stevens was trying to knee me in the upper torso.

(Rossi Aff. ¶ 3.)   Furthermore, Plaintiff claims that he continued to suffer abuse from the COs

after he had already been handcuffed:

> When the handcuffs were on . . . .  I was then placed in the back in
> the corner of the H-Block door, where they tried to run me into the
> wall head first and brutally beaten by the officers, one of which
> used a baton to strike me several times on the back of the legs,
> parts of my lower back, and back of the forearm.  I was punched,
> beaten and clubbed several times before the supervisor said 'that's
> enough.'

(*Id.*)  Thus, Plaintiff's testimony is that there was little or no need for force, that the relationship

between the threat and the amount of force used was disproportionate, that the COs at most

perceived a minimal threat, and that the COs made only slight efforts to temper the severity of

the abuse.  (*Id.*)

Despite the fact that Defendants' rendition of the facts contradicts that of Plaintiff, and,

notwithstanding Defendants' corroborating evidence – including the testimony of several

officers and a misbehavior report (Defs.' 56.1 ¶ 35; Defs.' Ex. L) – Plaintiff's allegations survive

Defendants' Motion for Summary Judgment.  As a general rule, "district courts may not weigh

evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City*

*of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson*, 477 U.S. at 249 (noting that

at the summary judgment stage, the court is not to "weigh the evidence and determine the truth

of the matter").  "Although [Plaintiff's] evidence may be thin, his own sworn statement is

adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290-91 (2d Cir.

2003) (holding that "[b]y finding against [Plaintiff] on the basis of the disparity between some of

[Plaintiff's] medical records and statements in his affidavit, the district court made an

impermissible credibility determination and weighed contradictory proof. The credibility of

[Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a

finder of fact"); *see also Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999)

("Assessments of credibility and choices between conflicting versions of the events are matters

for the jury, not for the court on summary judgment."); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d

Cir. 1984) (reversing grant of summary judgment and noting that "[i]t appears from the affidavits

filed by appellees that [Plaintiff's] case may well be without merit . . . . Nonetheless,

[Plaintiff's] affidavit in opposition to the motion for summary judgment does raise material

factual disputes, irrespective of their likely resolution").

 While courts have granted summary judgment based on the incredulity of a plaintiff's

testimony, they have done so sparingly. For example, the Second Circuit has held that "in the

rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of

which is contradictory and incomplete, it will be impossible for a district court to determine

whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine

issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys*,

426 F.3d at 554 (internal citations and quotation marks omitted). In this case, Plaintiff's version

of the incident is not limited by any fatal internal inconsistencies in his story, but primarily by

the lack of corroboration of his testimony. Therefore, although Plaintiff's evidence is open to

credibility challenges, the Court finds that it is sufficient to create a genuine issue of fact – one

which is "undoubtedly material to the resolution of his claim." *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1990); *see also Corselli v. Coughlin*, 842 F.2d 23, 26-27 (2d Cir. 1998) (reversing grant of summary judgment because "a jury could find for [the inmate-plaintiff] if it believed [the plaintiff's] allegations" about the behavior of the officers). Accordingly, Defendants' Motion for Summary Judgment is denied with regard to Plaintiff's excessive force claim.

### 2. Due Process Claim

Plaintiff claims that his due process rights were violated during the Tier III disciplinary hearing conducted by Temple because: (a) Temple was biased and denied Plaintiff a fair and impartial hearing; (b) Plaintiff was refused the right to present documentary evidence at his hearing; and (c) Plaintiff was convicted at the hearing based on less than substantial evidence. (Smith R&R 21-24.)

To make out a Section 1983 claim for denial of due process at a disciplinary hearing, Plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the [D]efendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (internal quotation marks omitted). With regard to the first prong, an inmate may demonstrate a deprivation of his liberty interest under the due process clause of the Fourteenth Amendment if a prison condition imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin*, 515 U.S. at 484). As to the second prong, though each state may determine its own procedures for disciplinary hearings, the minimum procedural requirements of due process include: "(a) written notice of the claimed violations . . . ; (b) disclosure to the [prisoner] of evidence against him; (c)

13

opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board . . .; and (f) a written statement by the factfinders as to the evidence relied on . . . ." *Wolff v. McDonnell*, 418 U.S. 539, 559 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)); *see also Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) ("*Wolff*'s protections apply to an inmate facing SHU confinement and that an inmate has a right to a fair and impartial hearing officer.").

Thus, to make out a due process claim against Defendant Temple, Plaintiff must show: (1) that his 12-month confinement without privileges in the SHU constituted a deprivation of a protected liberty interest; and (2) that such deprivation was the result of the procedural defects he identifies. The first element of Plaintiff's due process claim is met here. Generally, "[a] prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer*, 364 F.3d at 65 (quoting *Sandin*, 515 U.S. at 484). Under the law of the Second Circuit, confinement for a period "longer than [305 days] . . . under 'normal SHU conditions' is a 'sufficient departure from the ordinary incidents of prison life to require procedural due process protections . . . .'" *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000)). Thus, Plaintiff's 12-month confinement in the SHU deprived him of a protected liberty interest.

The Court turns now to Plaintiff's claim that he was afforded insufficient process because he was not provided with an impartial hearing officer, he was denied an opportunity to present all documentary evidence, and he was convicted on less than substantial evidence.

### a. Biased Hearing Officer

Plaintiff claims that Temple was biased and denied him a fair hearing because Temple testified on behalf of Defendants Pangborn and Stevens, continuously interrupted Plaintiff while Plaintiff was trying to question Pangborn and Stevens, and avoided confronting contradictions in Defendants' testimony by using the Misbehavior Report to support his decision. (Pl.'s Decl. ¶¶ 5-6, 11.)

An inmate in a disciplinary hearing is entitled to an impartial hearing officer. *See Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 n.3 (2d Cir. 1977)). Indeed, under the Supreme Court's decision in *Wolff*, the hearing officer must be sufficiently impartial so as not to create a "hazard of arbitrary decision making." 418 U.S. at 571. However, the "degree of impartiality required of prison officials does not rise to the level of that required of judges generally. It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("We recognize that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally. Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). Under New York law, an official cannot serve as

a hearing officer if he/she witnessed the incident, was directly involved in the incident, was the officer to review the misbehavior report, or investigated the incident.  N.Y. Comp. Codes. R. & Regs. tit. 7 § 254.1 (2008).

Here, Temple was not compromised through direct involvement in the incident in question.  However, Plaintiff claims that Temple was not impartial because he testified on Defendants' behalf.  (Pl.'s Decl. ¶ 5.)  Plaintiff's evidence, however, falls short of establishing his claim.  For example, Plaintiff claims that Temple referred to Plaintiff's witnesses as "idiots." (Pl.'s Mem. 12.)  Here, however, Plaintiff misunderstands the thrust of Temple's comments: although Temple did refer to a pair of inmates as "idiots," he did so because they refused to testify for Plaintiff and had not signed proper refuse orders.  (Pl.'s Ex. C, Trans. of Tier III Disciplinary Proceedings (hereinafter "Pl.'s Ex. C"), 4-5.)  This incident reveals, if anything, Temple's contempt for those who were unwilling to assist Plaintiff.

The rest of Plaintiff's evidence related to this claim consists of incidents in which Temple paraphrased Defendants' direct testimony.  In the majority of these examples, Plaintiff charges that Temple's act of paraphrasing Defendants' testimony – typically by stating "the officer is saying . . . " – meant that Temple was, in effect, "testifying" for Defendants.  (*Id*., 52.)  The following is a representative example.  CO Pangborn testified to the following sequence of events:  he was the only CO escorting a group of inmates (*id*., 48); while doing so, he "noticed a bulge in [Plaintiff's] left pocket (*id*., 33); Pangborn then "pulled him out to pat frisked him" (*id*., 33); he "told [Plaintiff] to turn around and face the wall while we were getting the building, the rest of building 12 continued the escort" (*id*., 50); and Plaintiff first refused to face the wall but "finally complied and put his hands on the wall" (*id*., 34.)  Upon hearing this narrative, Temple

then summarized the testimony in the following manner:

> The officer is saying he was alone escorting a bunch of inmates, he
> asked you to step out of the line and go into the corner until, and to
> face the wall, and his goal was, he was gonna get the other inmates
> to move, and then he was gonna pat frisk. Is that basically it?
> That's it, so I mean, you know, that's it.

(*Id.*, 52.) Plaintiff objected to this summarization, and stated, "You're testifying for him. That's not what he said." (*Id.*, 20-22.)

The Court has reviewed the record of the hearing transcript and finds no significant inconsistencies in Temple's summarizations. In each of the examples cited by Plaintiff – including the representative example discussed above – Temple attempted to digest and restate the testimony of the Defendants, but he did not distort the testimony. Moreover, on the occasions when Plaintiff most vigorously objected to Temple's summations, Plaintiff was permitted to clarify the testimony restated by Temple.[7] While the Court is a bit perplexed by Temple's summaries of the testimony presented by Defendants under cross examination by Plaintiff, the Court's review of the record of the hearing does not reflect inconsistencies between

---

[7] In one particular exchange, Plaintiff argues that Temple attempted to change Stevens's testimony. (Pl.'s Decl. ¶ 11.) Plaintiff questioned Stevens about the details of the punch Plaintiff allegedly threw at Stevens. Stevens stated that Plaintiff punched him in the "left side of the head with a right closed fist." (Pl.'s Ex. C, 75.) Temple then restated Stevens testimony incorrectly, stating "he punched you in the right side." (*Id.*) Stevens, however, corrected Temple immediately, and Temple repeated the accurate testimony once corrected. (*Id.*) Here, rather than intentionally misrepresenting Stevens, Temple apparently misheard "right closed fist" as meaning a punch to the "right" side. Significantly, once the mistake occurred, Temple did not stop Plaintiff from clarifying Stevens' testimony, and permitted Plaintiff to question Stevens. (*Id.*, 76-92.)

Plaintiff also accuses Temple of restating Defendant Pangborn's testimony about the location of Stevens during the incident. (Pl.'s Decl. ¶ 11; Pl.'s Mem. 12.) In this incident – which is somewhat obscured by inaudible portions of the transcript – Plaintiff accused Temple of misconstruing the testimony of Pangborn. (Pl.'s Ex. C, 62-63.) Here, like with the discussion over the direction of the punch, any confusion was immediately remedied by supplemental clarifying questions. (*Id.*)

Defendants' testimony and Temple's paraphrases such that one might conclude that Temple was testifying for the COs, rather than merely summarizing testimony.

Plaintiff also claims that Temple interrupted him several times while Plaintiff was questioning Stevens and Pangborn. (Pl.'s Decl. ¶ 5.) Even if this is true, there is no indication in the record that the interruptions ultimately precluded Plaintiff from submitting any proper and relevant questions to the witness or from conveying any relevant information during the hearing.

Plaintiff also asserts that Temple unfairly used the Misbehavior Report to justify his hearing decision. Specifically, Plaintiff takes issue with the fact that Temple refused Plaintiff's request during the hearing to dismiss the proceedings because of inconsistencies between the COs' testimony and the Misbehavior Report. (Pl.'s Mem. 7.) However, Plaintiff's evidence of inconsistencies is negligible, and any inconsistencies that do exist are not relevant to the incidents for which he was charged. For example, Plaintiff argues that the testimony of the COs contradict each other and contradict the Misbehavior Report, (Pl.'s Mem. 5-6), because one CO testified that Plaintiff was arguing with him when ordered to face the wall, (Pl.'s Ex. C, 53), but the Misbehavior Report does not explicitly state that Plaintiff was arguing with the COs (Defs.' Ex. L, 25-26). Similarly, Plaintiff argues that the testimony and report are inconsistent by pointing to the fact that "the report says 'he told me to face the wall', and [the CO's testimony] was, 'I told him to get against the wall.'" (Pl.'s Ex. C, 46.) Even if such minor inconsistencies were relevant to the charges against him, Temple was under no obligation to rule in Plaintiff's favor in the face of these alleged, but minor, inconsistencies. *See Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("Due process is not synonymous with a requirement of scientific exactitude or error-free procedure.") (internal quotation omitted); *Peranzo v. Coughlin*,

608 F. Supp. 1504, 1508 (S.D.N.Y. 1985) ("[I]f due process does not require error-free

determinations in matters affecting the liberty interests of ordinary citizens, then mandating such

a level of accuracy would certainly overstate the requirements of due process in the context of

prisoner drug-testing.").  Temple appropriately exercised discretion in noting that he saw

"nothing major in anyone's testimony that really is that much different than what was reported."

(Pl.'s Ex. C, 97.)  Thus, Plaintiff's claims that Temple was biased and provided Plaintiff with an

unfair hearing are unsupported by the evidence before the Court and do not present a triable

issue of fact.

### b.  Right to Present Documentary Evidence

Plaintiff claims that because he was not given photographs that he requested of the COs'

injuries, he suffered a due process violation.  "An inmate has the right to . . . present [evidence]

on the inmate's behalf, provided the calling of witnesses or the disclosure of documentary

evidence does not jeopardize or threaten institutional or an individual's security.  *Kingsley v.

Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)); *see also Superintendent, Mass. Corr. Inst. v.

Hill*, 472 U.S. 445, 454 (1985) (noting that an inmate is entitled to "an opportunity, when

consistent with institutional safety and correctional goals, to call witnesses and present

documentary evidence in his defense" (internal citations omitted)).  However, this right "does

not entail an obligation on the part of prison officials to retrieve every document that an inmate

requests . . . [e]ven when documents are relevant and obtainable."  *Amaker v. Coombe*, No. 96-

CV-1622, 2002 WL 523388, at *10 (S.D.N.Y. Mar. 29, 2002); *see also Crawford v. Braun*, No.

99-CV-5851, 2002 WL 31426262, at *5 (S.D.N.Y. Oct. 28, 2002) (noting that "prison officials

must have the necessary discretion to keep [a prison disciplinary] hearing within reasonable

limits" (internal quotation marks omitted)); *Dixon v. Goord*, 224 F. Supp. 2d 739, 746 (S.D.N.Y. 2002) ("Deference to prison administrators [in refusing documentary evidence or a witness] may mean upholding a denial of a request even in situations where the 'denied witness *might* have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." (quoting *Afrika v. Selsky*, 750 F. Supp. 595, 601 (S.D.N.Y. 1990)). The Supreme Court has noted that "[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking" and that "[a]ny less flexible rule appears untenable as a constitutional matter." *Wolff*, 418 U.S. at 566. Thus, while the Supreme Court has held that an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals," *id.*, it also has held that prison authorities should be vested with "broad discretion," and that prison authorities may deny an inmate's request to present witnesses or evidence on the basis of considerations such as "irrelevance" or "lack of necessity," *id.*; *accord Kalwasinski*, 201 F.3d at 109 ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony."). However, the Supreme Court also has observed that should a prison official refuse to admit evidence on grounds such as irrelevance or lack of necessity, "it would be useful for [the hearing official] to state [his/her] reason for refusing to call a witness." *Wolff*, 418 U.S. at 566; *see also Ponte v. Real*, 471 U.S. 491, 497 (1985) ("[P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify . . . . [either] at the hearing, or they may choose to explain it 'later' [in a subsequent Court proceeding]").

Temple claims that he refused to retrieve and provide Plaintiff with photographs of the COs' injuries because they were not relevant to the charges pending against him. (Defs.' Ex. J, Temple Aff. (hereinafter "Defs.' Ex. J") ¶ 7.) The record, however, is far more ambiguous than Temple represents. In fact, Temple rejected the request out of hand, stating matter-of-factly, "[y]ou're not getting any photographs [of] the officers' injuries." (Pl.'s Ex. C, 103.) Temple did not state that such evidence was irrelevant, or give any other grounds for his decision. (Pl.'s Ex. C, 115.) This evidence – which may have been used to dispute the injuries allegedly inflicted by Plaintiff on the COs – arguably was relevant to the charges pending against Plaintiff. Accordingly, because Temple has not identified any reason why production of such photographs would have been unduly hazardous to institutional safety or correctional goals, his Motion for Summary Judgment on Plaintiff's Due Process claim based on failure to produce documentary evidence is denied.

### c. Conviction Based on Less than Substantial Evidence

Plaintiff claims that Temple issued an adverse decision in the Tier III hearing based on less than substantial evidence. An officer or disciplinary board presiding over an inmate's hearing need only support his decision with "some modicum of evidence" to withstand a Section 1983 claim. *Superintendent, Mass. Corr. Inst.*, 472 U.S. at 455-456; *see also France v. Coughlin*, No. 85-CV-6347, 1987 WL 10724, at *5 (S.D.N.Y. May 4, 1987) ("As to plaintiff's claim that there was insufficient evidence to support the disposition made by the hearing officer, as long as there was some evidence to support the determination it will pass constitutional muster."). This is not a demanding standard:

> [The] standard is met if 'there was some evidence from which the conclusion . . . could be deduced . . . .' Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

*Superintendent, Mass. Corr. Inst.*, 472 U.S. at 455-456 (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103, 106 (1927)).

Plaintiff in this case has failed to state a due process claim by arguing that Temple based his decision on less than substantial evidence. As mentioned above, Plaintiff asserts that trivial inconsistencies in the record render the evidence at the hearing insufficient. (Plaintiff even requested that Temple dismiss the entire proceeding due to these arguable inconsistencies.) (Pl.'s Ex. C, 96.) Over a span of three weeks, Temple conducted a five-day hearing during which Plaintiff was permitted to call witnesses, present relevant evidence, and offer his rendition of the events. (Defs.' 56.1 ¶ 34.) Pangborn and Stevens testified at the hearing, and Plaintiff questioned them to the extent that Temple deemed the questions relevant to the charges against Plaintiff. (*Id*. ¶ 35.) This Court finds that the misbehavior report, the testimony of the officers, and the testimony of Plaintiff constitute sufficient evidence on which to base a disposition. Because Plaintiff has failed to present evidence demonstrating a triable issue of fact as to his due process claim, Defendants' Motion for Summary Judgment for this claim is granted.

### 3. Access to Courts Claim

Plaintiff asserts that he was denied access to the courts because Defendants interfered with his outgoing mail, and, as a result, he was prevented from filing a timely objection to a report and recommendation in a separate legal matter. (Pl.'s 56.1 Resp. ¶ 48.) Plaintiff's alleged

injury stems from an adverse decision based on Plaintiff's failure to submit timely objections to a Report and Recommendation by Magistrate Judge David E. Peebles ("Peebles R&R") in a separate legal action in the Northern District of New York. The Peebles R&R, issued on October 24, 2003, denied Plaintiff's Motion for Summary Judgment and granted Defendants' Motion for Summary Judgment on all claims except Plaintiff's procedural due process claim. (Defs.' Ex. Q; Mem. Decision & Order of Judge Kahn (hereinafter "Def's Ex. Q"), 1; Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 24.) Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties were given ten days to object to the Peebles R&R. Beginning in December 2003, Plaintiff sent to the district court judge three letters, dated December 3, 2003, January 12, 2004, and January 18, 2004. The district court judge did receive the three letters, each of which referenced, but did not contain, his objections. (Defs.' Ex. Q, 2-3.) Finally, on January 20, 2004, the district court judge, Judge Kahn, adopted the Peebles R&R. One month later, Judge Kahn reconsidered the adoption of the Peebles R&R after receiving Plaintiff's Motion for Reconsideration dated February 20, 2004. (*Id.*, 1.) Judge Kahn denied Plaintiff's motion finding that (1) Plaintiff's allegations of mail mishandling were unsupported; and (2) that Plaintiff still had not submitted properly filed objections to the Court even after receiving several extensions. (*Id.*, 3-5.)

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986); *see also Bounds v. Smith*, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."); *Davidson v. Scully*, 694 F.2d 50,

53 (2d Cir. 1982) ("[T]he Constitution protects with special solicitude, a prisoner's access to the courts." (quoting *Sostre v. McGinnis*, 442 F.2d 178, 189 (2d Cir. 1971)).[8] To establish a violation of this right, "an inmate must show that the alleged inadequacies . . . caused him 'actual injury' – that is, 'actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim.'" *Lewis v. Casey*, 518 U.S. 343, 348 (1996) (internal citations omitted). Furthermore, the allegedly hindered lawsuit must have some merit, as frivolous lawsuits are not protected by the constitutional right of access to the courts. *See Stubbs v. De Simone*, No. 04-CV-5755, 2005 WL 2429913, at *16-17 (S.D.N.Y. Sept. 30, 2005) (holding that there was no violation of right to court access where underlying legal claim was barred by doctrine of collateral estoppel). Thus, to state a valid Section 1983 claim for denial of access to the courts based on interference with an inmate's legal mail, the inmate must satisfy two elements: that the deliberate and malicious interference impeded his/her access to the courts, and that, as a result of that interference, an existing meritorious action was prejudiced – that is, the inmate suffered actual injury. *See Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. March 29, 2001).

Here, Plaintiff's claim fails to satisfy the first element: Plaintiff has not presented any evidence of deliberate or malicious behavior. Plaintiff puts forth no evidence tending to show why Superintendent Phillips or any prison guard would act maliciously toward him or

---

[8] Though *Bounds* focused on making law library facilities accessible to inmates, "it stressed that that was merely 'one constitutionally acceptable method to assure meaningful access to the courts,' and that '[the *Bounds* decision] . . . does not foreclose alternative means to achieve that goal.' In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring reasonable access to the courts." *Lewis*, 518 U.S. at 351 ("Insofar as the right vindicated by *Bounds* is concerned, 'meaningful access to the courts is the touchstone.'") (quoting *Bounds*, 430 U.S. at 830-31).

deliberately tamper with his mail. Instead, Plaintiff's evidence consists of the following: (1) admissions by Defendants that prisoners had issued complaints regarding mail delivery in the past; (2) a procedural defect with regard to the way mail is collected at the SHU;[9] and (3) the fact that Plaintiff's objections (assuming they were actually mailed to the court) were not received by the Court. (Pl.'s Mem. 14.) From this, Plaintiff makes a conclusory assertion that the objections were "obviously thrown out by the guard." (*Id.* 15.)

Plaintiff presents insufficient evidence – direct or circumstantial – that his mail was tampered with by the guards. To the contrary, the evidence indicates that mail was flowing properly in and out of the prison. In the months following the issuance of the Peebles R&R, Plaintiff sent a series of letters to the Judge Kahn's chambers. The record indicates that each of these letters was received – all, that is, except of the letter purporting to contain Plaintiff's objections to the Peebles R&R.[10] The fact that three of Plaintiff's letters were received by Judge Kahn within a six-week window fatally undermines Plaintiff's mail tampering claim. Moreover, even if Plaintiff did have evidence of tampering – which he does not – a single incident of tampering, which is all that Plaintiff alleges, is generally insufficient to establish a constitutional violation. *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (noting that "an isolated

---

[9] New York law requires that outgoing mail be put in mailboxes, 7 N.Y. Comp. Codes R. & Regs. tit. 7, § 720.5 (2008), whereas at the Green Haven SHU the inmates placed their mail on the gate to be picked up by the guard (Pl.'s Mem. 15.) This evidence, however, is not dispositive. *See Rivera*, 232 F. Supp. 2d at 123 ("[T]he failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim. Similarly, violations of state law procedural requirements do not alone constitute a deprivation of due process." (internal citations omitted)).

[10] The Court takes notice of the fact that a courtesy copy of Plaintiff's objections to the Peebles R&R arrived at the New York State Attorney General's Office within the proscribed time. (Def.'s Ex. Q, 4.)

incident of mail tampering is usually insufficient to establish a constitutional violation" but "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts . . . ."). Accordingly, on the evidence presented, no reasonable jury could conclude that the prison deliberately and maliciously interfered with his mail.[11] Therefore, Defendants' Motion for Summary Judgment is granted with regard to Plaintiff's access to courts claim.

## III. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is denied with regard to the excessive force claim, granted with regard to the access to courts claims, and granted in part and denied in part with regard to the due process claims. The Clerk of Court is respectfully directed to terminate the pending motion. (Dkt. No. 42.)

SO ORDERED.

Dated:     September 30, 2008
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[11] Summary judgment on this claim would be appropriate even if Plaintiff had shown evidence of deliberate or malicious behavior because Plaintiff cannot demonstrate actual injury. To establish actual injury, Plaintiff would have to show that the loss of his mail "prejudiced his ability to pursue a legal claim." *Key v. Fischer*, No. 05-CV-10461, 2007 WL 2522352, at *4 (S.D.N.Y. Sept. 6, 2007). Even construing all facts in the light most favorable to Plaintiff, however, the loss of his mail did not injure his claim. Rather, any alleged injury stems from Plaintiff's own failure to state timely objections to the Peebles R&R even after receiving several extensions from Judge Kahn. (Defs.' Ex. Q, 2-3.)

26

Service List by Mail:

Rudolph Rossi
87-A-9513
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, NY 12051
*Pro Se Plaintiff*

Jose L. Velez, Esq.
New York State Office of the Attorney General
120 Broadway
New York, NY 10271
*Counsel for Defendants*